Filed 7/21/26  P. v. Davtyan CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>KARAPET DAVTYAN,<br><br>  Defendant and Appellant. | B344219<br><br>Los Angeles County<br>Super. Ct. No. BA230474 |

APPEAL from an order of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed.

Christopher Lionel Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Nicholas J. Webster, Deputy Attorneys General for Plaintiff and Respondent.

——————————————

In 2003, a jury convicted appellant Karapet Davtyan of assault with a firearm and other crimes related to his scheme to kidnap Armen Mkrtumyan for ransom.  On April 25, 2019, Davtyan was granted parole. When released from prison, he was placed in Immigration and Customs Enforcement (ICE) detention.  Because his conviction for assault with a firearm was an aggravated felony under federal immigration law, an immigration judge ordered Davtyan—a lawful permanent resident at the time of his conviction—removed from the United States under the Immigration and Nationality Act (8 U.S.C. § 1101 et seq.)  He was subsequently removed to Armenia.

On January 7, 2024, Davtyan returned to the United States and applied for asylum.[1]  On August 19, 2024, while his asylum case was pending, Davtyan filed a motion to vacate his 2003 convictions pursuant to Penal Code section 1473.7, subdivision (a)(1).[2]  The superior court denied the motion.

Davtyan appeals the superior court's denial of his motion to vacate, contending that it was reasonably probable that he would have attempted to negotiate an immigration-safe disposition in lieu of proceeding to trial.  Davtyan also argues that the superior court improperly struck his testimony about his role in the conspiracy and excluded his trial counsel from testifying at the hearing.  We affirm the superior court's orders.

---

[1]    According to the opening brief, Davtyan has since been removed again to Armenia.

[2]    All further undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Defendant's background and prior criminal history

Davtyan was born in Armenia on August 26, 1972.  He came to the United States in 1991 and became a lawful permanent resident.

Davtyan's prior criminal history includes a 1993 conviction for petty theft (§ 484, subd. (a)), a 1997 conviction for grand theft (§ 487, subd. (a)), a 1998 conviction for commercial burglary (§ 459), and a 1999 conviction for petty theft with prior convictions (§§ 666, 484, subd. (a)).

### II.     Facts[3]

In January 2022, while on probation and seeking court-ordered treatment at the Tarzana Treatment Center, Davtyan befriended James Patlan, who had recently been released from prison and was also seeking treatment.  Davtyan solicited Patlan to participate in a conspiracy to kidnap an Armenian businessman for ransom.  Davtyan offered Patlan a weapon and up to $200,000 to act as the kidnapper.  Davtyan, his brother-in-

---

[3]     At Davtyan's request, we take judicial notice of the nonpublished decision in coconspirator Arutyun Khrayan's case, *People v. Khrayan* (Apr. 2, 2012, B213582).  We derive our factual and procedural background of this case from that nonpublished opinion, and from the nonpublished opinion affirming Davtyan's judgment of conviction, *People v. Davtyan* (Oct. 5, 2004, B168441).  We reference the factual portions only "for background purposes and to provide context for the parties' arguments." (*People v. Flores* (2022) 76 Cal.App.5th 974, 978, fn. 2.)

law and codefendant Manvel Davtyan,[4] and a third coconspirator Khrayan (also known as "the fat man" or "Gordo") gave a 9-millimeter nickel-plated Smith and Wesson handgun, a taser gun, and duct tape to Patlan.

On January 27, 2002, Manvel and Khrayan drove Patlan to a warehouse loading dock owned by Armen Mkrtumyan, their intended victim. Patlan approached Mkrtumyan, who drew his own concealed gun. A gunfight ensued. Both Patlan and Mkrtumyan were shot and injured, and both sought treatment at the same hospital in Glendale, California. While Mkrtumyan was speaking with police officers at the hospital, Patlan was wheeled past his open emergency room door on a gurney, and Mkrtumyan identified Patlan as the shooter. Patlan was arrested at the hospital.

On March 20, 2002, Patlan entered into a use immunity agreement, agreeing to cooperate with the police without any specific promises being made. He told the police detective about the kidnapping conspiracy and Davtyan's and Manvel's involvement. Patlan could not provide information about Khrayan's identity, since he only knew him by his aliases. The police knew that a third coconspirator was involved but did not know his identity.

Patlan pled guilty to conspiracy to commit kidnapping (§§ 182, subd. (a)(1), 207, subd. (a)) and agreed to a prison term of 14 years.

---

[4] To avoid confusion, Manvel Davtyan will be referred to as "Manvel."

### A. Trial court proceedings

Davtyan and Manvel proceeded to a jury trial. On February 19, 2003, the jury convicted Davtyan of conspiracy to commit kidnapping for ransom (§§ 182, subd. (a)(1) & 209, subd. (a); count 1), attempted kidnapping for ransom (§§ 664, 209, subd. (a); count 2), solicitation to commit kidnapping for ransom (§ 653f, subd. (a); count 3), and assault with a semiautomatic firearm (§ 245, subd. (b); count 4).

On May 30, 2003, the trial court sentenced Davtyan to life in prison for conspiracy to commit kidnapping for ransom (§§ 182, subd. (a)(1) & 209, subd. (a)) and nine years for assault with a firearm (§ 245, subd. (b)).[5] On October 5, 2004, the judgment was affirmed on appeal.[6]

### B. Immigration proceedings

On April 25, 2019, Davtyan was released from prison, transferred into ICE custody, and placed in removal proceedings. An immigration judge ordered him removed from the United States due to his conviction for an aggravated felony and he was removed to Armenia. In January 2024, he returned to the United States to apply for asylum, and was detained by ICE.[7]

---

[5]     On the remaining counts, the trial court imposed and stayed terms pursuant to section 654.

[6]     *People v. Davtyan*, *supra*, B168441.

[7]     The evidence accompanying Davtyan's motion to vacate alleges that on June 4, 2023, he was attacked in Armenia because of "his non-traditional sexual orientation."

### C. *Motion to vacate*

On August 19, 2024, Davtyan, through counsel, filed a motion to vacate the conviction pursuant to section 1473.7, subdivision (a)(1). Davtyan argued that his conviction should be vacated because he did not meaningfully understand and knowingly accept the potential immigration consequences of the charges against him, and his attorney failed to advise him and failed to defend against adverse immigration consequences. He claimed that if he had understood, he would have asked his counsel to pursue additional defenses, alternative strategies against the charges, or immigration-safe alternatives instead of risking trial.

Along with his motion, Davtyan submitted, inter alia, a letter from immigration attorney A. Ashley Gambourian. Gambourian noted that Davtyan was presently ineligible for asylum and withholding of removal due to his aggravated felony convictions. However, she asserted, if Davtyan's convictions in this case were vacated, he could file a motion to reopen his removal proceedings with the immigration court, and if granted, he could be eligible for asylum and withholding of removal.[8]

The District Attorney filed an opposition to Davtyan's motion. The District Attorney argued that Davtyan failed to address the second prong of the section 1473.7 analysis, since he

---

[8] Gambourian noted that the Department of Homeland Security could also find Davtyan removable based on his theft convictions, and therefore three of his four theft convictions would also need to be vacated to avoid another charge of removability. Davtyan stated in his opening brief that his theft convictions have since been vacated.

6

failed to show prejudicial error. First, the District Attorney argued that Davtyan failed to show that he would have been offered an immigration-safe plea had his attorney requested one, or that the trial court would have accepted such an offer. Moreover, the District Attorney contended that Davtyan failed to show an alternate trial tactic that could reasonably have led to a different result, considering the case against Davtyan "was strong, with a cooperating codefendant supported by eyewitness testimony and physical evidence."

Davtyan filed a reply brief, in which he argued that according to *People v. Carrillo* (2024) 101 Cal.App.5th 1, 20 (*Carrillo*), section 1473.7, subdivision (a)(1), does not require the defendant to demonstrate a reasonable probability that he would have taken an "alternate path" that would have resulted in an immigration-neutral outcome in order to demonstrate prejudice. Rather, Davtyan argued, *Carrillo* merely set forth one way that a defendant can show prejudice. Davtyan asserted that there are "numerous ways to show prejudice," and the court must consider the totality of the circumstances when evaluating prejudice.

Davtyan also argued that there were potentially immigration-safe options available to him when he chose to go to trial. For example, he argued that he could have accepted a guilty plea to multiple counts of accessory after the fact (§ 32), or conspiracy to be an accessory after the fact (§§ 182, subd. (a)(1) & 32) with consecutive sentences of 364 days or less in county jail; misdemeanor false imprisonment (§§ 182, subd. (a)(1) & 32); or solicitation to commit kidnap (§§ 653(f), subd. (a), 209).

Lastly, Davtyan argued that he demonstrated prejudice through his strong evidence of substantial ties to the United States. Davtyan noted that at the time of his trial, he had been

in the United States for 11 years as a lawful permanent resident, the majority of his family, including his parents, three of his siblings, his wife, his daughter, and his newborn son, were living in the United States, and he had no ties to Armenia.

The prosecutor opposing the motion to vacate introduced notes from the original District Attorney's file. Specifically, a note from July 5, 2002, indicated that the former prosecutor informed Davtyan's attorney, Jilbert Tahmazian,[9] of the possibility of a plea offer if he and Manvel were willing to cooperate with the prosecution and provide Khrayan's identity. According to the prosecutor's notes, in February 2003, she offered Davtyan and Manvel determinate sentences of 18 years.

At the hearing, Davtyan testified that the prosecutor offered him 18 years in prison and offered 15 years in prison for Manvel. He added that the offer was a "package deal," meaning both Davtyan and Manvel had to agree to take the offer. Davtyan testified that Manvel rejected the offer. Davtyan also testified that he did not know about the possibility of testifying against any coconspirator in exchange for any offer.[10]

At the hearing, Davtyan contended that since the District Attorney was open to settlements, the District Attorney may

---

[9] Davtyan and Manvel were both represented by attorney Tahmazian. The prosecutor advised the trial court of the conflict of interest arising from the dual representation. The court instructed Tahmazian to have his clients execute waivers of the conflict of interest in writing.

[10] Khrayan was later convicted in a separate trial, where Patlan testified. Patlan negotiated an additional four years off his sentence in exchange for his testimony.

8

have offered a potentially immigration-safe charge at the time of trial if Davtyan had agreed to cooperate, especially considering the District Attorney offered Patlan a lower sentence after he cooperated.

### D.    The superior court's order

On January 31, 2025, the superior court held a hearing on the motion to vacate. The court found that Davtyan was not properly advised of his immigration consequences, and had strong ties to the United States. The court stated that the only remaining issue was whether Davtyan demonstrated prejudicial error.

On February 3, 2025, the court issued a memorandum of decision on Davtyan's motion to vacate. The court determined that Davtyan failed to demonstrate that, "in light of the 'totality of the circumstances,' [he] 'would have done something differently—that is would have taken another path—and the alternate path would have resulted in an immigration neutral outcome.' " The court found that the circumstances in Davtyan's case were similar to *Carrillo*, where the court rejected the petitioner's claim for relief under section 1473.7 after finding the petitioner failed to show by a preponderance of the evidence that his lack of understanding of his immigration consequences prejudiced his decision to go to trial. The court stated that Davtyan's conviction for conspiracy to commit kidnapping carried a mandatory sentence of life in prison, and Davtyan did not produce any evidence to establish, in light of the severe penalty for his conviction, that any plea offer with immigration-neutral consequences was available to him. The court noted that the plea offer presented to Davtyan immediately before trial was life in

9

prison.[11] Moreover, the court found that Davtyan did not establish any alternate trial tactics that may have led to a different result in his case, and failed to show any alternate options that his trial counsel may have taken both before or during his trial which would have led to an immigration-safe outcome. Accordingly, the court determined that Davtyan failed to show by a preponderance of the evidence that he was prejudiced by his failure to meaningfully understand the actual or potential adverse consequences of a conviction of the charges in his case, and denied Davtyan's motion to vacate.

Davtyan timely appealed.

## DISCUSSION

### I.    Section 1473.7, subdivision (a)(1)

Under section 1473.7, subdivision (a)(1), a person who is no longer in criminal custody may move to vacate a conviction on the ground that the conviction was "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." To establish that a conviction was legally invalid on this ground, a "defendant must first show that he did not meaningfully understand the immigration consequences" of his litigation strategy. (*People v. Espinoza* (2023) 14 Cal.5th 311,

---

[11]    This statement appears to be incorrect, since the plea offer presented to Davtyan was for 18 years. The superior court's error was inconsequential, since 18 years is still significantly more than the 364 days that would be required to avoid immigration consequences.

10

319 (*Espinoza*).) "Next, the defendant must show that his misunderstanding constituted prejudicial error." (*Ibid.*)

Under section 1473.7, subdivision (a)(1), a misunderstanding of immigration consequences is prejudicial if there is a "reasonable probability" that, absent the misunderstanding, the defendant would have adopted a different strategy. (*Espinoza, supra*, 14 Cal.5th at p. 319.) Thus, where a defendant accepts a plea bargain, a misunderstanding is prejudicial if " 'the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.' " (*Ibid.*) Similarly, where, as here, a defendant "decides to go to trial, loses, and is sentenced, [the defendant] can establish prejudice" under section 1473.7 "by showing there is a reasonable probability that (1) he or she would have done something differently—that is, would have taken another 'path' [citation]— and (2) the alternate path would have resulted in an immigration-neutral outcome." (*Carrillo, supra*, 101 Cal.App.5th at p. 20.) "A reasonable probability does not mean more likely than not." (*Id.* at p. 19.) Instead, a reasonable probability is "merely a reasonable chance, which is more than an abstract possibility"—that is, a "probability sufficient to undermine confidence in the outcome." (*Ibid.*)

In determining whether there was a reasonable probability that a defendant would have adopted a different strategy, courts "weigh all relevant circumstances." (*Espinoza, supra*, 14 Cal.5th at p. 321.) Such circumstances include not only the defendant's ties to the United States, but also "whether alternative, immigration-safe dispositions were available" and, in particular, "whether the defendant would have had reason 'to expect or hope' that a plea deal without immigration consequences 'would or

11

could have been negotiated.' " (*Id*. at pp. 323– 324.) As the moving party, the petitioner in a section 1473.7 proceeding bears the burden of proof by a preponderance of the evidence. (§ 1473.7, subd. (f)(1); see also *People v. Vivar* (2021) 11 Cal.5th 510, 534 (*Vivar*).)

## II. Standard of review

An appeal from the denial of a motion to vacate under section 1473.7 is subject to independent review. (*Espinoza*, *supra*, 14 Cal.5th at p. 319.) Under this standard, " ' "an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." ' " (*Id*. at pp. 319–320.) We "give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [superior court] heard and observed.' " ' (*Ibid*.)

## III. Davtyan has not established prejudicial error

We have no reason to dispute the superior court's determination that Davtyan did not meaningfully understand the immigration consequences of his litigation strategy. Nor do we have any reason to dispute the superior court's finding that Davtyan had strong ties to the United States at the time of his trial. (*Espinoza, supra*, 14 Cal.5th at p. 323 [noting "a defendant's deep and long-standing ties to the United States are among the totality of circumstances that can support an inference that immigration consequences were of paramount concern at the time of the defendant's guilty plea"].)

But strong ties to the United States alone are insufficient to demonstrate prejudicial error. It is Davtyan's burden to establish under the totality of the circumstances a reasonable probability that "his lack of understanding of immigration

12

consequences prejudiced his decision to go to trial or the presentation of his defense at that trial." (*Carrillo, supra*, 101 Cal.App.5th at p. 22.)  To meet this burden, Davtyan can show "a reasonable probability," that is "more than an abstract possibility" that he "would have taken another 'path' [citation] . . . and . . . the alternate path would have resulted in an immigration-neutral outcome." (*Id.* at pp. 19–20.)  Applying this principle, the court examines "what decisions [Davtyan] could have made differently to avoid 'the actual or potential adverse immigration consequences of a conviction' or the combination of a conviction and sentence." (*Id.* at p. 20.)

Davtyan argues that it was reasonably probable that if he had known the immigration consequences of a conviction, he would have cooperated with the prosecution and attempted to negotiate an immigration-safe plea instead of going to trial. However, there is no evidence in the record demonstrating a reasonable probability that an immigration-safe negotiated disposition was possible at the time of his 2003 convictions.  Nor does the evidence support that Davtyan "had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar, supra*, 11 Cal.5th at p. 530.)

First, as his immigration attorney noted, even without considering Davtyan's 2003 convictions, Davtyan had already been convicted of four separate crimes that were considered "crimes involving moral turpitude" under federal immigration law.[12]  Therefore, at the time of his trial in 2003, Davtyan was

---

[12]    Davtyan's immigration attorney explained that Davtyan's 1992 conviction for petty theft (§ 484, subd. (a)), his 1997 conviction for grand theft (§ 487, subd. (a)), his 1999 conviction

already removable from the United States for having been convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct. (8 U.S.C. § 1227(a)(2).) Accordingly, even in the highly unlikely scenario that the District Attorney had offered Davtyan an immigration-safe plea for the kidnapping charges, Davtyan would have still been removable from the United States in 2003 based on his previous theft convictions.

In any event, the record does not demonstrate a reasonable probability that Davtyan could have obtained an immigration-safe plea agreement in lieu of going to trial, since it is extremely unlikely that the District Attorney would have offered Davtyan a plea to a charge supported by a factual basis that would not be considered an aggravated felony for immigration purposes.

An aggravated felony conviction renders a noncitizen removable from the United States. (8 U.S.C. § 1227(a)(2)(A)(iii).) Under the Immigration and Nationality Act, the term "aggravated felony" means "a crime of violence (as defined in section 16 of title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year." (8 U.S.C. § 1101(a)(43)(F).) Title 18 United States Code section 16, in turn, defines the term "crime of violence" as: "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its

_____

for commercial burglary (§ 459), and his 1999 conviction for petty theft with prior convictions (§ 666) were all crimes involving moral turpitude for immigration purposes. These four convictions have since been vacated. Nevertheless, they were still valid in 2003, when Davtyan chose to go to trial.

14

nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

The record shows that before the trial, the District Attorney extended two separate plea offers on unspecified charges—one consisted of a life term, and the other consisted of 18 years in state prison. Although the offers did not specify charges, kidnapping was generally considered an aggravated felony. (*Delgado-Hernandez v. Holder* (9th Cir. 2012) 697 F.3d 1125, 1127–1128 (*Delgado-Hernandez*) [holding kidnapping under § 207, subd. (a) is a crime of violence under 18 U.S.C. § 16(b) because kidnapping presents a " 'substantial risk that physical force . . . may be used.' "].)[13]

Davtyan argues that the District Attorney's offer to Patlan to plead guilty to a lesser charge is evidence that he "could have reasonably expected or hoped to cut a deal with the prosecution if

---

[13] Although *Delgado-Hernandez* was decided nine years after Davtyan's conviction, its holding expressly affirmed the Ninth Circuit's prior long-standing conclusion that kidnapping was considered a crime of violence because it "generally presents a risk of substantial force." (*Delgado-Hernandez*, *supra*, 697 F.3d at pp. 1127–1128, 1133, citing *United States v. Lonczak* (9th Cir. 1993) 993 F.2d 180, 181–183 [child stealing under California law, a similar offense to kidnapping, is a crime of violence under the United States Sentencing Guidelines even if it is committed by "fraudulently" "enticing" a child away from the child's parent because of the risk of "physical injury" to the victim]; see also *United States v. Williams* (9th Cir. 1997) 110 F.3d 50, 52–53 [kidnapping committed by deception, rather than force, constituted a crime of violence because kidnapping "by its very nature, involves a substantial risk of physical violence"].)

15

he testified against [Khrayan]." However, Patlan's plea agreement included a conviction for an aggravated felony. Patlan was originally charged with the same offenses as Davtyan. After cooperating with the prosecution, he accepted an offer to plead guilty to conspiracy to commit kidnapping (§§182, subd. (a)(1) & 207, subd. (a)). His sentence was reduced to 14 years for testifying against Davtyan and reduced further to 10 years for testifying against Khrayan. The disposition for Patlan was not an immigration-safe alternative. (*Delgado-Hernandez*, *supra*, 697 F.3d at pp. 1127–1128.)

The totality of the evidence—including the two offers that the District Attorney extended to Davtyan, the disposition offered to Patlan after cooperating with the prosecution, the gravity and sophistication of the crimes and Davtyan's significant role in planning them, his extensive and escalating criminal history, his probationary status at the time the crimes were committed, and his lack of demonstrated rehabilitation—indicates that the District Attorney would not have been amenable to a plea for a significantly lesser charge in this case.[14] (*Espinoza, supra*, 14

---

[14] Davtyan suggests that the following offenses would be immigration-safe: conspiracy to commit accessory after the fact (§§ 182, subd. (a)(1) & 32) without specifying the underlying offense, with a sentence of less than a year; misdemeanor false imprisonment (§ 236); or solicitation to commit kidnapping (§§ 653f, subd. (a) & 209). The record does not support that the District Attorney would have considered offering any of these options. (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 665 ["[defendant's] counsel *now* engages in speculation that he could have pled to burglary, without any citation from the record indicating that disposition would have been entertained by the prosecutor"].)

16

Cal.5th at p. 323 [noting the factors relevant to whether the prosecutor would offer a plea include "the defendant's criminal record, the strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, the district attorney's charging policies with respect to immigration consequences, and the existence of comparable offenses without immigration consequences"].)

The instant case is readily distinguishable from *People v. Avena* (2026) 119 Cal.App.5th 624, where Division Two of the Fourth District concluded the appellant demonstrated a reasonable probability that he could have obtained an immigration-safe plea agreement in lieu of going to trial. In *Avena*, a change of law occurred before the appellant's jury trial that rendered the possibility of an immigration-safe plea that was supported by a factual basis. (*Id.* at p. 633.) The appellant testified, and his trial attorneys confirmed that he was not informed of this possibility. (*Ibid.*) The appellant also demonstrated a reasonable probability that both the court and the prosecutor would have agreed to this possible immigration-safe plea. (*Id.* at pp. 633–634.) The appellant offered the prosecutor's testimony about what parameters he had for any plea offer, demonstrated that the immigration-safe theoretical option met those parameters, and showed that the potential sentence would have been equal to the prosecutor's original plea offer. (*Ibid.*) Under these circumstances, the court concluded the appellant established "a reasonable probability that he would not have proceeded to a jury trial had he understood the immigration consequences [and] . . . a reasonable probability that such a path would have resulted in an immigration-neutral outcome." (*Id.* at p. 632.)

In contrast, Davtyan fails to demonstrate more than an "abstract possibility" that he would have adopted a different strategy, or that he "had reason 'to expect or hope' that a plea deal without immigration consequences 'would or could have been negotiated.' " (*Carrillo, supra*, 101 Cal.App.5th at p. 20; *Espinoza, supra*, 14 Cal.5th at p. 323.)

Nor can we simply presume that the trial court would have automatically approved a plea bargain for a lesser charge negotiated between the District Attorney and Davtyan. "In exercising their discretion to approve or reject proposed plea bargains, trial courts are charged with the protection and promotion of the public's interest in vigorous prosecution of the accused, imposition of appropriate punishment, and protection of victims of crimes. [Citation]. For that reason, a trial court's approval of a proposed plea bargain must represent an informed decision in furtherance of the interests of society . . . ." (*In re Alvernaz* (1992) 2 Cal.4th 924, 941.)

## IV. Davtyan forfeited his claims relating to the superior court's evidentiary rulings at the section 1473.7 hearing

Lastly, Davtyan argues that the superior court erred by not permitting his trial counsel, Tahmazian, to testify at the section 1473.7 hearing and by stopping Davtyan from testifying about the details of his role in the conspiracy. The Attorney General responds that Davtyan forfeited his claims by failing to properly raise them in his opening brief and by failing to object before the superior court. We conclude that Davtyan has forfeited his claims.

First, in his opening brief, Davtyan raised these issues in a perfunctory manner, without argument or legal analysis, and

18

therefore, he failed to properly present them on appeal. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [reviewing court need not review undeveloped, perfunctory claims]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [appellate court need not address issues presented "without pertinent argument or an attempt to apply the law to the circumstances of th[e] case"].)

Furthermore, Davtyan failed to make an offer of proof showing why this testimony was relevant. "The proponent of proffered testimony has the burden of establishing its relevance . . . . [Citations.] Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 724.) "[A] reviewing court may not consider a claim that the trial court erroneously excluded evidence unless '[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means . . . .' (Evid. Code, § 354, subd. (a).)" (*People v. Hardy* (2018) 5 Cal.5th 56, 103.) Because Davtyan failed to make an offer of proof showing why Tahmazian's testimony and his own testimony about his role in the conspiracy were relevant, he forfeited his appellate claims.

Lastly, the trial court did not abuse its discretion in excluding Tahmazian's testimony, as well as Davtyan's additional testimony about the facts of the underlying case. Tahmazian's testimony would have been cumulative to his declaration. Davtyan's testimony about the underlying facts of the case was not necessary to determine the issue of prejudice for his motion to vacate.

19

DISPOSITION

We affirm the order.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


HANASONO, J.


We concur:



EGERTON, Acting P. J.



ADAMS, J.